1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   UNITED STATES OF AMERICA          CRIMINAL ACTION NO. 00-280
                                      NEW ORLEANS, LOUISIANA
5        VS.                          THURSDAY, OCTOBER 25, 2006
                                      9:30 A.M.
6   KENNY KINDELL LUCAS               SECTION "N"

7

8                     **REVOCATION HEARING**
            BEFORE THE HONORABLE KURT D. ENGELHARDT
9              UNITED STATES DISTRICT COURT JUDGE

10

    A P P E A R A N C E S:

11

    FOR PLAINTIFF,                    JOHN F. MURPHY
12  UNTED STATES OF AMERICA:          U.S. Attorney's Office
                                      Hale Boggs Federal Building
13                                    500 Poydras Street, Room 210
                                      New Orleans, Louisiana 70130
14                                    (504) 680-3000

15

16

17  FOR THE DEFENDANT,                ROMA A. KENT
    KENNY KINDELL LUCAS:              Assistant Public Defender
18                                    Hale Boggs Federal Building
                                      500 Poydras Street, Room 318
19                                    (504) 589-7930

20

21

    REPORTED BY:                      VICTOR D. Di GIORGIO, CCR
22                                    OFFICIAL COURT REPORTER
                                      500 Poydras Street, Room 406
23                                    New Orleans, Louisiana  70130
                                      (504) 589-7782

24

25  Proceedings recorded by mechanical stenography.
    Transcript produced by computer aided transcription.

1

2

3                              INDEX

4   WITNESS                                              PAGE

5

6

7

8   MICHAEL FULHAM

9        By Mr. Murphy...........................8/15

10       By Ms. Kent...............................8

11

12

13

14  KENNY KINDELL LUCAS

15       By Ms. Kent..............................17

16       By Mr. Murphy.........................22/27

17

18

19

20

21

22

23

24

25

1

2                        **P-R-O-C-E-E-D-I-N-G-S**

3                  (9:30 A.M.   -   MORNING SESSION)

4                    (THURSDAY, OCTOBER 25, 2006)

5           THE CLERK:  All rise.

6           THE COURT:  You maybe seated.

7           THE CLKER:  Criminal Docket Number 00-28.  United

8     States verus Kenny Lucas.

9           MR. MURPHY: Your Honor, John Murphy on behalf of the

10    United States.

11          MS. KENT:  Roma Kent on behalf of the defendant, Kenny

12    Lucas who's present before the Court.

13          THE COURT:  Good morning.

14          All right.  The defendant is before the Court to answer

15    a Rule to Revoke Supervised Release.

16          The Court notes that an amended rule to revoke

17    supervised release was filed on October 23rd, 2006, to add --

18          MS. KENT:  What?  I'm sorry.

19          THE COURT:  Yes.  You don't have that Ms. Kent?

20          MR. MURPHY:  It was filed electronically.

21          MS. KENT:  One moment, please, Judge.  Yes, it was.

22          THE COURT:  It was an alleged violation.  Do you have

23    that?  Mr. Fulham is here by the way.

24          MS. KENT:  Okay.

25          THE COURT:  You've got a copy of the amended rule?

1          MS. KENT:  No, sir, I don't and I don't have a copy of

2     the letter that was written on October 17th to this Court.

3          I'm turning pages, Judge, and it is not noted that I

4     will get a cease -- you know a copy of the letter written to

5     this Court concerning an October 4th positive.

6          MR. FULHAM:  If I may, Your Honor.

7          THE COURT:  Go ahead, Mr. Fulahm.

8          MR. FULHAM.  We wrote you a letter for yourself and we

9     asked Mr. Murphy to amend the Rule, and it's our understanding

10    that once the Rule is amended it would be distributed to all

11    parties, and Ms. Kent is -- I believe the only thing it mentions

12    is the last positive.

13         THE COURT:  Right.

14         MR. FULHAM:  Earlier this month, and she's well aware

15    of that positive.

16         THE COURT:  That's my understanding as well.

17         MS. KENT:  It's in the dispositional, Your Honor.

18         THE COURT:  Right.  Is there an objection to proceeding

19    on the amended rule at this time?

20         MS. KENT:  Can I see it?  I don't have a copy of the

21    amended rule, Your Honor, I'm not saying --

22         THE COURT:  Well, go ahead and take a look at it.

23    Let's see if we can get this done.

24         MS. KENT:  Okay.

25         MR. MURPHY:  And it was filed electronically.  I think

1    it goes to all parties immediately when we do that.

2         MS. KENT:  I'm not arguing, Judge, for one minute that,

3    I'm not sure of the problem that we're having.

4         THE COURT:  Okay.

5         MS. KENT:  Now, this positive was on October 4th, which

6    I understand, Your Honor, was the day before we were appointed,

7    is that correct?

8         THE COURT:  Well, does the record reflect when --

9         MR. FULHAM:  Before the initial appearance.

10        THE COURT:  So it's not a post bond situation.

11        THE COURT:  Right.  That's my understanding.

12        MS. KENT:  Yes, sir.

13        THE COURT:  Okay.  Is there any objection to proceeding

14   on the amended rule at this time?

15        MS KENT:  No, sir.

16        THE COURT:   Okay.  Is there any reason why the hearing

17   should not be held at this time, any other reason?

18        MR. MURPHY:  Not from the government, Your Honor.

19        MS. KENT:  Not from the defense, Your Honor.

20        THE COURT:  On February 7th, 2001, the defendant was

21   sentenced by the United States District Court for the Eastern

22   District of Louisiana, judge Edith Brown Clement presiding, to

23   70 months imprisonment, which was followed by a three-year term

24   of supervised release upon his release from confinement.  On

25   April 25th, 2002, the prison sentence was reduced to 54 months

1   of imprisonment.  For the duration of his supervised release,

2   the defendant was ordered to comply with the mandatory and

3   standard general conditions of supervised release that been have

4   adopted by this Court and prohibited from possessing a firearm.

5   In addition, certain special conditions, including participation

6   in a drug testing and/or treatment program as directed by the

7   probation officer were imposed.  The defendant's term of

8   supervised commenced on March 5th, 2004.

9       This rule to revoke supervised has been called for the

10  following alleged violations of the conditions of supervised.

11  Release.

12      First, testing positive for hydromorphone on January

13  25th, 2005, as a result of taking Vicodine prescribed to his

14  mother.  The Court understands that the defendant admits to

15  using the Vicodine on that occasion.  Second, testing positive

16  for cocaine on May 10, August 2, and October 4, 2006.  The Court

17  understands that the defendant has admitted to using cocaine on

18  or around these dates.  Third, the failure to complete the

19  orientation and life skills program and failing to report on

20  August 17, and September 14, 2004, to scheduled sessions that

21  would have satisfied this condition.  Fourth, failing to report

22  to the Methodist Counseling Center for an unscheduled urinalysis

23  on September, 2004.  Fifth, failing to submit monthly

24  supervision reports for July 2005, through January 2006, until

25  February 2006. Sixth, failing to report to the United States

1    Probation Office on September 6, 11, 18, and 26 of 2006.

2         Any evidence or stipulations from the government or the

3    defendant with regard to these alleged violations?

4         MR. MURPHY:  Your Honor, the government would offer to

5    stipulate that the probation officer would testify to those

6    violations just read by the Court.

7         MS. KENT:  We could so stipulate, Your Honor, but

8    reserving our right to cross-examine Mr. Fulham with the Court's

9    permission.

10        THE COURT:  Okay.  Go ahead and do that then.

11        MR. MURPHY:  With the stipulation, Your Honor, the

12   government has nothing further to offer. I will initially call

13   the witness and then immediately tender him to the defendant.

14        THE COURT:  Let's go ahead and do that.

15        MR. MURPHY:  Your Honor, the government call the

16   probation officer, Mr. Michael Fulham.

17        THE COURT:  Okay.

18        THE CLERK:  Please, raise your right hand.

19                          MICHAEL FULHAM

20        After having been first duly sworn, did testify under

21   oath, as follows:

22        THE CLERK:  Thank you you.  Maybe seated, and please

23   state your name for the record?

24        THE WITNESS:  Michael Fulham.  F-U-L-H-A-M.

25                        DIRECT EXAMINATION

1  BY MR. MURPHY:

2  Q.    Mr. Fulham, you're the probation officer assigned to Mr.

3  Kenny Lucas in this case?

4  A.    Yes, sir, I am.

5  Q.    And you just heard the Court just summarize offenses, but

6  that accurately reflects the offenses listed in your report, is

7  that correct?

8  A.    Yes, sir.

9  Q.    As well as the updated offense you provided in a letter

10  that serves as the basis for the amended rule to revoke filed on

11  October 23rd?

12  A.    Yes,

13          MR. MURPHY:  I would tender the witness, Your Honor.

14          THE COURT:  All right. Go ahead, Ms. Kent.

15          MS. KENT:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17  BY MS. KENT:

18  Q.    Mr. Fulham, while serving his sentence, Mr. Lucas is actual

19  sentence was reduced, was it not?

20  A.    Yes, it was.

21  Q.    And is it your understanding, sir, that this reduction in

22  sentence was pursuant to a Rule 35?

23  A.    I believe so, but I would have to check the records if

24  you'd like me to.

25  Q.    Do you doubt it?

1  A.   Was it filed as a 5K?  I mean, I don't --

2        THE COURT:  They're first cousins, that's my

3  understanding.

4        MS. KENT:  Yes, sir.  5K before sentencing, Rule 35

5  after sentencing.

6        THE WITNESS:  Okay.  Yes.

7                        EXAMINATION

8  BY MS. KENT:

9  Q.   And this was as a result of cooperation with the

10 government?

11 A.   That's my understanding.

12 Q.   And since then, you have learned that two people close to

13 Mr. Lucas have been killed, is that right?

14 A.   That is correct.

15 Q.   And, in fact, his cousin was killed not too long ago,

16 actually shot to death on Mr. Lucas' -- right in front of Mr.

17 Lucas' house, is that right?

18 A.   Yes.

19 Q.   And it is the assumption or the conventional wisdom that

20 the cousin looked like Mr. Lucas or net the same physical

21 description?

22 A.   Yes, he did.

23 Q.   And it could be construed that the cousin who was killed,

24 actually it was a mistake, and the perpetrators of this homicide

25 were actually looking for Mr. Lucas, is that right?

1   A.    That's what he tells me.

2   Q.    Okay.  And do you have any reason to doubt it?  No?

3   A.    Well, I spoke to the Gretna Police Department in reference

4   to his cousin's murder, Walter, I believe his name was, just to

5   see if Walter had the same build as Kenny Lucas, because I

6   didn't want to buy his story on his own words, so the detective

7   confirmed that Walter was a big man just like Kenny, about 6'2",

8   and he's a big man, so that that's true.  The detective also

9   indicated that it's possible that Walter was doing things,

10  illegal activities and that could have led to his murder, not

11  necessarily the person just saying that's Kenny Lucas, let's

12  shoot him because of his past cooperation, so I mean,that's what

13  I know.

14  Q.    It's conjecture on that.  For the opposite side, it's

15  conjecture as well?

16  A.    Yes, for both sides, yes.

17  Q.    But he was killed in front of Mr. Lucas' house?

18  A.    Which was also, I believe -- this was a family compound

19  type environment,so they all lived close.

20  Q.    All right.  Mr. Lucas is working, is he not?

21  A.    Yes, he is.

22  Q.    And he's working for Beverly Industries?

23  A.    That's correct.

24  Q.    As a truck driver?

25  A.    Yes.

1  Q.   And he got this job actually before he was released on

2  bond, but he started it when he was released on bond?

3  A.   Yes.

4  Q.   And he has four children?

5  A.   I believe that's correct.

6  Q.   And his fiancée is pregnant, is that right?

7  A.   Yes.

8  Q.   And she's in the courtroom today?

9  A.   Yes.

10 Q.   Okay.  And he's supporting these four children?

11 A.   To my knowledge.

12 Q.   And his fiancée?

13 A.   I believe she supports herself, she has a job.

14 Q.   Now, Mr. Lucas clearly has a drug problem, does he not?

15 A.   I believe so.

16 Q.   And you had indicated that you were going to put him in

17 drug counseling, drug treatment, but for the short hearing date,

18 is that right?

19 A.   Well, he was placed in drug treatment, and according to Mr.

20 Lucas he reported for at least one session.  I believe it's his

21 initial appointment, and he could answer better what other

22 programs he's attended.  I haven't received any progress reports

23 during this short time frame.

24 Q.   And when did you sign him up for the drug treatment?

25 A.   This current term of drug treatment was initiated post

1    detention hearing.

2    Q.    But where in relation to the filing of the motion to

3    continue the hearing?

4    A.    When did you file the motion and when did he start drug

5    treatment, is that what you're asking me?

6    Q.    Yes.

7    A.    I tell you what, you tell me when you filed the motion and

8    I'll tell you when he was referred to drug treatment.

9    Q.    Okay.  The motion was filed on October 20th, at 10:08 a.m.

10   oh, no, it was entered at 10:08, but filed that same date.

11   A.    Well, the paperwork I'm looking at was signed in August and

12   it was never sent through because of the problems we were having

13   and it was put through post detention.

14   Q.    Okay.  All right.  And Mr. Lucas has also requested mental

15   health treatment, has he not?

16   A.    Yes, he has.

17   Q.    And this was due to the fact that relatives are being

18   killed and it's certainly very distressing?

19   A.    That's what he tells me, yes.

20   Q.    And it would be a normal reaction?

21   A.    I think so.

22   Q.    And he was released on bond on October 10th, is that right?

23   A.    I believe so.

24   Q.    Yeah.  And he was placed on electronic monitoring, is that

25   right?

1   A.    Yes.

2   Q.    And he's living at his mother's house?

3   A.    Yes.

4   Q.    Also in Gretna, but not where the cousin was killed, is

5   that right?

6   A.    That's right.

7   Q.    He's living in another address?

8   A.    Yes.

9   Q.    And he was put on electronic monitoring on the 10th?

10  A.    Yes.

11  Q.    Or actually --

12  A.    The 11th.

13  Q.    The 11th.  He was actually released on the 11th, is that

14  right?

15  A.    Yes.

16  Q.    So that you could set up the electronic monitoring?

17  A.    Correct.

18  Q.    And since he has been on the electronic monitoring, which

19  is now two weeks to the day?

20  A.    Yes.

21  Q.    He's been under full compliance, has he not?

22  A.    We know of no violations.

23  Q.    Okay.  So he's been under compliance?

24  A.    We've had problems with the equipment with it monitoring

25  his compliance, and basically the coverage comes and goes

1  unfortunately, but then when the coverage is working he's in

2  compliance.

3  Q.    Perfect.  And this has nothing to do with would Lucas?

4  A.    Not at all.

5  Q.    It's an electronic problem?

6  A.    It's a technical difficulty.

7  Q.    And he's working for Beverly as a truck driver?

8  A.    Yes.

9  Q.    And you agree to -- you said you had no objection to

10 continuing the hearing until December, is that right?

11 A.    You asked me that last week or the week before, and I said

12 yes,

13        MS. KENT:  Perfect. I tender the witness.

14        THE COURT:  How many hours a week does he work for

15 Beverly, do you know?

16        MR. FULAHN:  It's my understanding it's a full time

17 job.  I believe he leaves home in the a.m. schedule, the

18 monitoring schedule, 5:30 in the morning.  He gets home 5:30 or

19 6:00 in the evening.

20        THE COURT:  That's Monday through Friday.

21        MR. FULHAM:  Yes.

22        THE COURT:  And what type of vehicle is Mr. Lucas

23 driving, anyone?  Do you know, Mr. Fulham or Mr. Lucas?

24        THE DEFENDANT:  Dump truck, sir, a Triaxle, some time

25 8:00.

1    THE COURT:  Thank you.  All right, Mr. Murphy.

2    REDIRECT EXAMINATION

3  BY MR. MURPHY:

4  Q.   Ms. Kent talked about some dangerous situations Mr. Lucas

5  says he was in or people around him was in.  If he were showing

6  up and reporting that to you under supervision, what would you

7  do with that information?

8  A.   Well, I would caution him on his activities, his

9  whereabouts, and I would, and I have told him, you know, using

10  drugs and being in an environment where you can find drugs,

11  would not be a safe environment for anyone.

12  Q.   And has he shown himself to be willing to submit to your

13  supervision to give him that advise?

14  A.   No, he don't.  Unfortunately, he was under the false

15  impression that a warrant would be issued for his arrest for

16  probation violations much soon than it was.  No reflection on

17  the Court, that's just when I petitioned the Court, and because

18  I was trying to help Mr. Lucas trying to work with him to get

19  him in compliance post Katrina, and, you know, establish drug

20  treatment, a residence, and he was dodging me, and he knew it,

21  and while he was dodging me, I believe he was stressed about his

22  cousin's situation.  His two cousins were murdered at different

23  times, but also I could only surmise why he didn't want to come

24  see me, he would be urine tested, but,you know, he would be a

25  better person to answer that than me.

1  Q.   Do you believe he's amenable to supervision under

2  supervised release?

3  A.   He hasn't been so far, no.

4         MR. MURPHY:  I have nothing further, Your Honor.

5         THE COURT:  All right.  Thank you.  You can step down,

6  sir, thank you.

7         Anybody else?

8         Any other witnesses you intend to call.

9         MS. KENT:  Your Honor, we would call Kenny Kindell

10  Lucas.

11         THE COURT:  Mr. Lucas, come up here, sir, and please

12  remain standing until you take the oath.

13         THE CLERK:  Please raise your right-hand.

14                      KENNY KINDELL LUCAS

15         After having been first duly sworn, did testify under

16  oath, as follows:

17         THE CLERK:  Thank you.

18         You maybe seated, and please state your name for the

19  record.

20         THE WITNESS:  Kenny Kindell Lucas.

21         THE COURT:  You have to speak into that microphone.

22  You can turn it down, pull it down.

23         THE WITNESS:  Kenny Kindell Lucas, K-I-N-D-E-L-L.

24                      DIRECT EXAMINATION

25  BY MS. KENT:

1    Q.    Mr. Lucas, where are you working?

2    A.    At Beverly Industries.

3    Q.    And what do you do there?

4    A.    I'm a truck driver.  I actually haul all different type of

5    material, asphalt --

6              THE COURT:  Speak a little bit louder.

7              THE WITNESS:  Asphalt, sand, whatever we brought to the

8    construction site.

9                              EXAMINATION

10   BY MS. KENT:

11   Q.    And what are your hours?

12   A.    From 5:45 I report to work, and I get home usually about

13   5:00 or 5:30, something like that.  It all depends on the job

14   that we're working on that particular day.

15   Q.    And is this five days a week?

16   A.    Yes, ma'am, sometimes Saturdays, but I haven't had any

17   Saturdays yet, but they do, sometimes they do work on Saturdays,

18   but it is Monday through Friday.

19   Q.    And you have a commercial driver's license, do you not?

20   A.    Yes, ma'am.

21   Q.    CDL?

22   A.    Yes, ma'am.

23   Q.    Do you hold any other licenses?

24   A.    Ma'am, I'm sorry.

25   Q.    Do you hold any other licenses?

A.    Yeah, I'm also a licensed barber.  I went to school for
that when I come home from prison in 2004, I went to barber
college, Kenny's Barber College, and I'm a certified barber by
the State of Louisiana.  In 2005, I went to the Diesel Truck
Driving Academy, and I perused a commercial driver's license,
Class CDL License.

Q.    All right.  In January of 2005, almost two years ago now,
you submitted a urine sample to Methodist and you were positive
for Hydromorphone and you said you were taking Vicodine, what
was that about?

A.    I was working on a particular job, and I had hurt my back
and at the time my mom gave me a Vicodine.  She said maybe this
will help you, and she gave me a Vicodine to stop the pain.  I
didn't know at the time that was illegal to take that.  I didn't
think nothing of it, I was in so much pain.  At the time I
didn't have medical insurance, I couldn't afford to go and see a
doctor so I just took the pill for my back.

Q.    Where had you been working when you hurt your back?

A.    At the time I was doing some work with my step father.  He
has his own company as a carpenter.  He do a lot of construction
work.  He build houses, reframe houses, and I believe I was
doing some work with him at that time.

Q.    Now, in May, May 10th, August 2nd, and October 4th, you
tested positive at the probation office for cocaine.  Do you
remember what those three occasions were about May, August, and

1  October?

2  A.    Yes, ma'am.  I mean, I was going through so things, and I

3  actually told my parole officer that I needed some help that I

4  picked up a drug habit using drugs, and I'm going through -- I

5  honestly told him before I even took the drug testing that, you

6  know, I used this drug, and that I need some counseling, and

7  then he told me at the time, you know, they're short of staff

8  right now, I'll try to get you in, but he told me they was short

9  of staff and it was a waiting process?

10  Q.    Why did you slip back into drugs?

11  A.    Well, all the problems had emerged after the Katrina I lost

12  some friends, and I lost my apartment, my apartment where my

13  fiancée and my four kids was staying at, and I had a little

14  trucking business myself before the hurricane.  I had saved up

15  some money and I bought a dump truck for $5,000, and I was

16  making enough money to sustain me and my family, and I lost the

17  truck after the storm, during the storm.  Not only that, but my

18  momma lost her place, and my sister lost her place, and seeing

19  my family all over just living on the streets nowhere to stay, I

20  mean, we were sleeping in shelters and stuff like that, it

21  hurted me, you know, and I never experienced a feeling like that

22  and it put me in a state of depression and I believe that was

23  the main reason why I went -- you know, I did those drugs, and

24  after that, you know, my cousin got killed in front of my house,

25  and that was my mother's sister's child, somebody that I grew up

1    with all my life, and that actually I never experienced losing

2    anybody that close and that was another thing, and then one

3    thing thing led to another.  And right after the storm, I mean,

4    I come back down and I was actually living on the streets.  You

5    know, me and my oldest son was actually living in my car, you

6    know, I had nowhere to go.  I was staying with one of my

7    cousin's and he put me out because he wanted me to pay rent that

8    I couldn't afford, and, you know, I was just going through a

9    great deal of depression, and two weeks after my cousin get

10   killed in front of my house another one of my cousin's get

11   killed.  You know, someone told me, I believe that one of my

12   cousin's got killed because on account of me, something that

13   I've done, you know, with the government, and I told my parole

14   officer way before my cousin -- my probation officer way before

15   my cousin got killed that I needed to leave because I think my

16   life was in danger.

17   Q.   Now, the house that you were living in where your cousin

18   was killed, is that your house?

19   A.   No, that's my cousin house.  Actually I was staying in a

20   trailer in the side yard right on his house.  He allowed me to

21   put a trailer in his side yard, and my cousin got killed right

22   on the side of the trailer.

23   Q.   All right.  And when Magistrate Shushan released you on

24   bond, where did you move in?

25   A.   With my mother and father on Congress Street and Louisa.

1   Q.    Now, did you move in by yourself or did you and your wife

2   -- and your fiancée and your children?

3   A.    Me, and my fiancée and my four kids.

4   Q.    And how was that working out?

5   A.    It's working out pretty good.  I mean, it's a roof.  It's a

6   shelter.  My momma's always been there to support me of my

7   situation, you know, and I lost everything, and I'm trying to

8   rebuild and at the same time I was going through this problem,

9   so my momma, right after my cousin got killed, she like, "I

10  don't want you to stay around there no more".  Because during the

11  time my cousin got killed we was actually walking around, him

12  and my fiancée was walking with two year old daughter, they was

13  walking, they was all walking home together, one of my auntee's

14  called her back, and she turned around and walked back to the

15  house, but my cousin kept going, going like towards my house and

16  somebody was right there and he shot him five times, and if my

17  auntee wouldn't have called my fiancée with my two year

18  daughter, I believe they would have been dead also, and just to

19  think about something like that, I mean, it put me in a bad

20  state of mind, and I did tell my probation officer many times

21  that my life was in danger way before my cousin was murdered, so

22  when this actually took place, I mean, it -- I mean, I just -- I

23  was hurt, you know, like, man, that's where the problems begin.

24  Q.    How is your job with Beverly Industries working out?

25  A.    It's great.  I love my job, and people like me.  I see

1  myself rebuilding.  I'm finally getting myself back established

2  and hopefully if I leave here today with my fiancée we're going

3  to get an apartment, and we're to get me and my children back

4  under one roof and hope everything works out, but it's great,

5  you know, that's what I went to school for to drive trucks, and,

6  you know, I paid for the school myself.  I worked and I saved my

7  money and I didn't get any grants or anything, I paid it all out

8  of my own pocket.  I paid for the school, it was five grand.  I

9  paid, working with step father, I cut hair, and that's something

10  that I wanted to do and I went to school and I pursued it, and,

11  you know, it's seems like it's paying off.

12  Q.   Okay.  Have you started drug treatment?

13  A.   Started my first -- I had an individual session, it was

14  Monday, Monday at 5:30.  Today would be my first group session,

15  and it would be for 5:30 to 6:30 Monday through Friday, and also

16  take a urine test eight times a month, and it's intense for six

17  weeks, and after that it would go to then once a month, and so

18  on and so on.

19          MS. KENT:  All right.  I tender the witness.

20          Thank you, Judge.

21          THE COURT:  Mr. Murphy.

22                    CROSS-EXAMINATION

23  BY MR. MURPHY:

24  Q.   Lucas, I have a few questions.

25          You first came up positive for cocaine in May of 2006,

1  right?

2  A.    Right.

3  Q.    And then the last test that we have positive for cocaine is

4  in a letter from Mr. Fulham this month in October 2006.  That

5  covers almost a six-month period.  How often were you using

6  cocaine?

7  A.    I wouldn't say on a daily basis, but I was using it sort of

8  like sometime once a week, sometime twice a week.  It's just

9  when I got into a state of depression.

10  Q.    At least weekly though, is that right?

11  A.    Yeah, it started off -- it didn't start off weekly.  I

12  mean, it became a weekly habit once or twice later on down the

13  road.

14  Q.    And you knew what the rules were on supervised release as

15  far as taking illegal drugs, right?

16  A.    Yeah, I did.

17  Q.    You knew that was strictly prohibited?

18  A.    Yeah.

19  Q.    And you knew that you were subject to violation of your

20  supervised release and going back to jail if you didn't comply

21  with the rules, right?

22  A.    Right.

23  Q.    And you testified that you were concerned about getting

24  help but throughout the month of September on four separate

25  occasions, September 6th, 11th, 18th, and the 26th, just last

1  month, you didn't show up at all at probation, did you?

2  A.    No.    What happened, my probation seen me on Monday's.

3  The very first Monday that I was supposed to meet him my

4  brother-in-law told me that he came to the house, I believe this

5  was before that, and told me, he said, I was at work, I believe,

6  and he said that he wasn't going to be able to see me that he

7  had to go to a funeral or something like that, and my

8  brother-in-law told me that he said that he would call me and

9  let me know when to come back in, so that was my first, actually

10 day to see him.

11 Q.    But didn't you know you were supposed to report in

12 September on several occasions and actually physically come

13 here?

14 A.    Yeah, like I say, that agreement had just happened like

15 four extra days that I was supposed to go see him, it was new.

16 Q.    But you had an obligation to come and see him on those

17 dates, right?

18 A.    Yeah, but my brother-in-law told me that he said that --

19 the first date was cancelled, and was under the impression that

20 he would called me, and he said that he will call you and

21 schedule and let you know when to come back.

22 Q.    Now, Officer Fulham didn't say you don't need to show up,

23 did he?

24 A.    No, he didn't say that.

25 Q.    You took it on yourself to say that someone else, a

1   relative said you couldn't go see him, and so you decided you
2   wouldn't go, is that right?
3   A.   No, the first day that I was supposed to go he came to the
4   house and told him he cancelled the appointment. .
5   Q.   You described two very sad situations, the deaths of two,
6   is it cousins, both of them?
7   A.   Yeah.
8   Q.   You know that you using drugs on a frequent basis, you've
9   admitted to, is extremely dangerous, don't you?
10  A.   Yes, I do.
11  Q.   You're putting yourself and anyone else in danger around
12  you when you do that, right?
13  A.   Right.
14  Q.   Where would you buy the cocaine?
15  A.   You buy the cocaine off the streets.
16  Q.   And even with the death of close relatives you were willing
17  to continue to place yourself in a dangerous situation?
18  A.   No, I was seeking for help.  I told my probation officer
19  that I needed help way before this.  I wasn't reluctant about
20  taking test, and I'm not reluctant of the fact of telling him
21  that I did use drugs.  Actually, I called him and told him that
22  I had a problem I needed help.  I need help.  When you start
23  doing drug that's something you sometimes -- it's hard for you
24  to just walk away to be like other people to be drug free, it
25  just becomes a mental problem, and that's what it was, and it

was something that I needed help and I couldn't break aloose.  I

mean, now I have been straight for a month in between, but at

that particular time I was going through a great deal, and it

wouldn't make me no better because I was caught and most of the

time trying to find help me, and I was getting to where I

couldn't get no drug treatment.  I told him my life was in

danger and I got no satisfaction, and my cousin wound up being

killed just like no nobody like hearing what I'm saying what's

going to happen wait until I die and I'm dead and it's all over,

and I'm reaching out for help way before this problem in

October.  I was honest to my parole officer, and this is not

something that I come home to, and all of this happened after

Katrina, the storm, that I went through a great deal of

depression, a great deal of distress to see my momma who's

house, I see 10 people living in a FEMA trailer, that hurts, you

know, and that where the problem problem came about.  You look

back on the record, I have been home since 2003, September the

10th.  I never been positive for cocaine, not one time.  All

this happened after the storm, and after two of my cousins got

killed and since Katrina to now during the duration of that

time, I have been telling my parole officer I need help.

      MR. MURPHY:  I think you've answered my question. Thank

you.

      Nothing further, Your Honor.

      THE COURT:  Anything further, Ms. Kent?

REDIRECT EXAMINATION

BY MS. KENT:

Q.    Mr. Lucas, your three positives are May, August, and
October.  Back in May, where were you cousins killed, do you
know?

A.    Yes, my cousin was -- I believe it was August, something
like that.  I don't know the exact date.  I try to take my mind
off of it.  I don't know the exact date, but if I'm not mistaken
I believe it was in August.  I don't know the exact date.  I try
not to think about it no more.

        MS. KENT:  I have no further questions, Judge.

        MR. MURPHY:  Nothing further, and the government has
nothing further to present, Your Honor.

        THE COURT:  Okay.  Mr. Lucas, let ask you a couple of
questions.

        Counsel, tell me the date that Mr. Lucas appeared
before Magistrate Shushan.  What date is that?

        MS. KENT:  It was August 10th he appeared before the
magistrate.

        MR. MURPHY:  No, it was October.

        MS. KENT:  Excuse me October 10th.

        THE COURT:  October 10.  And Mr. Lucas, I understand
that you started your job at Beverly shortly after that, is that
correct?

        THE DEFENDANT:  No, it was before that.

1           THE COURT:  Before.  When did you start your job at

2     Beverly?

3           THE DEFENDANT:  The date that I was supposed to start

4     that was the date me and my fiancée, I voluntarily came up to

5     see my parole officer.

6           THE COURT:  I don't need to know the exact date, but

7     tell me when that was.

8           THE DEFENDANT:  It was on the 4th.  It was the 4th, I

9     was -- I believe I was apprehended on the 4th.  No, I'm sorry,

10    it was before the Storm on the 5th. I was apprehended on the

11    4th.

12          THE COURT:  So the 4th of October was the day you

13    started at ed Beverly you think?

14          THE DEFENDANT:  No, the 5th of October was the day that

15    I was supposed to start.

16          THE COURT: I got that.  So it was a few weeks ago?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  As part of that job application process or

19    as part of the job since you've been showing up there to work,

20    is there any drug testing that is required?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Okay.  And how often is that?

23          THE DEFENDANT:  I take a drug test when I first got

24    hired on with the job.

25          THE COURT:  And you passed that test?

1    THE DEFENDANT:  Yes.  Like I say, this wasn't something

2  I did on a daily basis.  It was something that I went through in

3  depression and I said, well, you know --

4    THE COURT:  Well, that's what I'm getting at, because

5  Mr. Murphy asked you a question about the frequency of your drug

6  use, and you indicated, if I understood you correctly, tell me

7  if I'm wrong, it was at least once or twice a week leading up to

8  the time when you were arrested and brought before Magistrate

9  Judge Shushan, is that correct?

10    THE DEFENDANT:  Yes.

11    THE COURT:  Okay.  Did you knowingly and voluntarily

12  use Vicodine on or around the date that you tested positive for

13  the Hydromorphone?

14    THE DEFENDANT:  Yeah, it was Vicodine.

15    THE COURT:  I understand the circumstances of your

16  mother, you had back pain.

17    THE DEFENDANT:  It was my mother's prescription.

18    THE COURT:  What about on the occasion of the cocaine

19  use, the dates that we've identified here today, did you

20  knowingly and voluntarily use cocaine on or around those dates?

21    THE DEFENDANT:  Yes.  Yes, Your Honor.

22    THE COURT:  Okay.  And what about the possession of the

23  cocaine on or about the dates that we have here?

24    THE DEFENDANT:  The possession?

25    THE COURT:  I mean, you possessed it or did somebody

1    administer it to you?

2         THE DEFENDANT:  Yeah, it was actually administered to

3    me.

4         THE COURT:  Well, but did you voluntarily use it on

5    that occasion?

6         THE DEFENDANT:  Yes.  Yes, I did.

7         THE COURT:  And did you possess it as part of your use

8    of it or did you stand at some distance and somebody administer

9    it to you while you were sleeping or --

10         THE DEFENDANT:  No, no, it was nothing like that.

11         THE COURT:  -- you were drowsy?

12         THE DEFENDANT:  It was not like that.  It was put down

13    on the table and I used it.

14         THE COURT:  All right.  Do you have any explanation,

15    other than what you've told us already here today, for your

16    failure to complete the orientation and life skills program and

17    your failure to report on August 17th, and September 14th of

18    2004 to go schedule sessions that would have satisfied that

19    condition?

20         THE DEFENDANT:  Well, sir, I wasn't under the

21    impression -- I didn't have any knowledge that I still had to go

22    to life skill meetings because I went to many of them when I

23    come home.  I mean, I just found this out this year.  I went to

24    many life skills programs, and I thought that I completed them

25    all.

1        THE COURT:  Okay.  What about the failure to report to

2    the Methodists Counseling Center?  It was an unscheduled

3    urinalysis that was set for September 6, 2004, that you didn't

4    report to.  Have you any explanation for that?

5        THE DEFENDANT:  I believe that I might have been

6    running late or something happened, I'm not sure it was, so long

7    ago, but I'm pretty sure was that there was a reason I didn't

8    show up.

9        THE COURT:  And you can't recall what that reason might

10   have been?  We're talking about September of 2004?

11       THE DEFENDANT:  No, sir, I don't remember.

12       THE COURT:  What about the monthly supervision reports?

13   It says here that you did not submit monthly supervision reports

14   for July of '05, through January of 2006, until February 9th of

15   2006.  Have you any explanation for your failure to submit those

16   reports?

17       THE DEFENDANT:  Well, I didn't know that I had missed

18   that many because I remember I know at one time I was sent to

19   the wrong address.  There was an address change.

20       THE COURT:  Okay.

21       THE DEFENDANT:  With the probation office, somewhere

22   down the line the address got changed, and I believe at one time

23   I was sent them off to the wrong address.

24       THE COURT:  And you had to report to the probation

25   officer on September 6th, 11th, 18th, and 26th of this year, a

1  couple of months ago, those were the four dates that you were to

2  report to the probation office, do you have any explanation for

3  your failure to report on those dates?

4          THE DEFENDANT:  Yes, sir.  The first one, my probation

5  officer came to the house and told my momma that I need to

6  rescheduled that he wouldn't be able to make it because he had

7  to go a funeral or something like that.  This is what was told

8  me to me once I come home from work and my brother-in-law told

9  me, he said, well, he'll call you.

10          THE COURT:   That's the one you were telling Mr. Murphy

11  about?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  What about the 11th, 18th, and the 26th?

14          THE DEFENDANT:  Those, I mean, I really didn't -- those

15  particular ones, I really -- to be honest with you I didn't show

16  up because I was -- I mean, I was really like I was scared, you

17  know, to be honest with you

18          THE COURT:  Did you try to call on those dates to tell

19  them that you --

20          THE DEFENDANT:  The date that I came to see him on the

21  4th, that was -- I voluntarily went over there.

22          THE COURT:  That was on October 4th?

23          THE DEFENDANT:  Yes, sir, my parole officer not calling

24  me, I was still waiting for his phone call to reschedule or

25  somethihing.  I was working, you know, I was going to work at

1  4:00 o'clock and getting off at 6:00 o'clock in the evening.

2          THE COURT:  Well, but that was when you were working.

3  You started working at the beginning of October, I'm asking you

4  about September 11th, 18th, and 26th.

5          THE DEFENDANT:  No, I was working for another job.

6          THE COURT:  Did you know you had to report on those

7  dates?

8          THE DEFENDANT:  Well, it was something -- that was

9  something that we had agreed on.  He said, "well, you're going

10 to need to start coming to see me".  It was something new.  He

11 told me that, like something like that.

12         THE COURT:  Whether it was new or not though, you

13 understood that on those dates you were to report?

14         THE DEFENDANT:  Yes, sir.  Yes, sir, I did.

15         THE COURT:  All right.  And again, have you any

16 explanation aside from what you just said about being scared,

17 have you any explanation for not even can calling the probation

18 also office on those days, and say, look, I know I'm supposed to

19 be there, but here's what's going on?

20         THE DEFENDANT:  I did call.  I did call, sir.

21         THE COURT:  On each of those dates?

22         THE DEFENDANT:  I don't know about each of those dates,

23 but I did recall calling, and I was -- at this take particular

24 time was still going through a great deal.  I thought that it my

25 life was in danger, and I kept putting a lot of emphasis on it

1   to my parole officer, and it got to a point where I actually got

2   scared to walk out the street period, and I was telling him what

3   was going on, you know.  It was a lot of killing going on the

4   west bank and I did call him twice.  I believe it was behind me

5   cooperating with the government.

6        THE COURT:  Have you anything else to say before the

7   Court would make a finding as to alleged violations other than

8   what you've already told us in response to Ms. Kent's questions,

9   Mr. Murphy's questions or mine, anything else you want me to

10  know that you haven't told us?

11       THE DEFENDANT:  No, I would just like to state for the

12  record, that I do apologize.  I'm sorry in not complying with

13  the rules of my supervision, and I'm sorry, and if another

14  change would be given, I mean, I would, you know, I would prove

15  to the Court, and not only to the Court, but to my family that I

16  can be a better person.  You see, all the problems did come in

17  after the Hurricane.  Before this, I never really had a problem

18  with my probation office.  Actually, when we evacuated we went

19  to Dallas, I went straight -- when we first made it to Dallas I

20  went straight to the parole office up there, and I said, "hey,

21  look, I'm an evacuee, coming from New Orleans.  I'm trying to

22  comply with my parole officer", and, you know, I didn't know

23  what to do, so I found out where he was at and I turned myself

24  in.

25       THE COURT:  You did have the incidences before Katrina

of the failure to report for the urinalysis, which was in
September of '04, and we also had the failure to complete the
orientation and life skills, which should have been done before
Katrina, so I understand your point about being scattered about
and trying to comply when people aren't where they're supposed
to be, but we did have some instances before that.

Anything further, Mr. Lucas, that you want to say?

THE DEFENDANT: No, sir.

THE COURT: You can step down, sir. Thank you.

Counsel, anything that you all would offer at this time
before the Court makes a finding as to alleged violations?

MR. MURPHY: Nothing further, Your Honor.

MS. KENT: Your Honor, the violations before Katrina,
the Vicodine, the life skills, Mr. Lucas, as he said, went to a
lot of life skills, and I believe Mr. Fulham can concur on that,
apparently no issue was made of it afterward until now when the
rule was filed.

The failure to show up for one urinalysis in September
of 2004. He'd been on supervised release since late 2003, and
since then that was one miss. I don't know why it was, but it
was one of many, many. Since then, Judge, Mr. Lucas' life has
fallen apart. He lost his house, his family their house, he
lost his dump truck, which was his means of support. He's
living in a FEMA trailer, life was not good. Cousins dying and
may well have been killed because of what he did to get the Rule

1    35.

2            Your Honor, all we are asking, and the government had

3    no objection, and probation had no objection, would the Court

4    consider holding a ruling in abeyance for two weeks, four weeks,

5    whatever?  And it's just a constant proving if Mr. Lucas can --

6    he's doing fine for the last two weeks.  It's like his last

7    chance and he knows it.  If the Court would holdup, even for two

8    weeks.  If he does fine between now and two weeks, great.  If he

9    doesn't, shame on him.

10           THE COURT:  Ms. Kent, let me tell you the problem I

11   have with that.  I gave your motion to continue a lot of

12   thought, a lot of consideration, and wasn't inclined to grant

13   it.  The problem I have in this case, amongst several of the

14   other things that I've heard here today, that this gentleman is

15   driving not just a truck, but big trucks using drugs, and he

16   just testified to that, and I can't good in good conscious

17   simply to continue to report to work, continue to drive trucks

18   on public streets where people could be injured when he's under

19   the influence of any type of illegal substance, and that scares

20   me.  It really scares me.  When I sat back and thought about it,

21   I would like to give him a chance.  I think he's made some

22   efforts that I appreciate.  I'm not so sure that he's a person

23   who needs to be on supervised release, quite frankly.  You know,

24   he's had some problems meeting the conditions, but at times he

25   has tried, and I have no doubt that if I roll this over for two

1    weeks that his conduct would be exemplary for two weeks.  The

2    problem is what happens when he gets in an accident?  His

3    license hasn't been revoked yet, but if he gets in an accident

4    driving a truck, not only does he create a liability problem for

5    his employer, which is the least of my concerns at this point,

6    the problem is that someone could get seriously injured or

7    killed by an accident that's brought about by a driver under the

8    influence of an illegal substance of cocaine.  If he's using

9    cocaine more than once a week, if he's using it once a week, I

10   don't know on day he's using it such that he's reporting to work

11   and getting behind the wheel of the largest vehicle on the

12   highway, and if something like that happens, then I consider it

13   my responsibility.  And for his future if that were to happen,

14   he would lose his license to ever driver a truck and never be

15   able to support his family again.  Now, he has a barber's

16   license, and not to be cute about this, but if he were to use

17   the barber's license and give somebody a bad haircut while he's

18   under the influence of some type of drug, you know, it will grow

19   back.  The problem is, is he's driving trucks, and I assume

20   making a good living at it so that he can support his family,

21   that's very commendable, but I cannot in good conscience allow

22   him to continue to do that when I have full knowledge, and I've

23   heard testimony here today that he has a drug problem.  I would

24   like for him to have overcome it, and I have decided a way that

25   I think is ultimately going to be best for him and his family,

1  because I think his testimony supports that most of these

2  alleged violations of supervised release have, in fact,

3  occurred.  So the problem is how do I fashion a way that I can

4  be sure that the public safety is protected?  That he's

5  protected?  He's testified that he's in a position where he's

6  afraid for his life as, what's going on in his neighborhood, and

7  that's understandable.  It's well-documented that there's a lot

8  of bad stuff going on in some of these bad neighborhoods on the

9  west bank.  I don't doubt that at all, but he's in fear for his

10  safety at this point.  You know, there's got to be a solution

11  that's tailored to meet those concerns, and me simply saying,

12  well, back another day and let's hope that Mr. Lucas has done

13  better, doesn't satisfy any of those concerns.  You know, God

14  forbid, you know, something could happen to him in the next two

15  weeks if he's concerned about his neighborhood.

16           MS. KENT:  Your Honor, when I asked Mr.-- and it was

17  totally, you know, I no idea, I just asked the question.  How is

18  your job going?  And he said, "great".  That was just his

19  immediate response.

20           Judge,if he's under Mr. Fulham's supervision, and he's

21  being drug tested regularly by Beverly Industries, he will be

22  clean.

23           THE COURT:  Well, he hasn't said that he's been drug

24  tested.  He said that he got drug tested as part of his job

25  application.

1    MS. KENT:  They say it's random, sir.  For probation

2    you have to show up on a certain day and you have to be clean to

3    show up on that day, but the random drug testing, I think, is

4    probably the most effective, and I'm sure Beverly Industries is

5    as aware of their liability as the Court.

6    THE COURT:  Well, they're aware of their liability

7    generally.  I don't know if they're aware that he's here today

8    because of the test that he's failed here in the past.  I don't

9    know if he's disclosed that to them.

10   MS. KENT:  I don't know, but he's been clean, Judge.

11   He's been clean since he was released on bond.  His family

12   expense on him, and he knows that, and he has been working and

13   doing everything that Mr. Fulham requires.

14   MR. MURPHY:  Your Honor, I didn't realize I might have

15   been passing up an argument when I said nothing further, I was

16   thinking along the line of evidence.  But the government fully

17   concurs with the concerns of the Court.  When you look at just

18   the cocaine issue you're talking about almost a six-month period

19   from the first test to the most recent, and in his own admission

20   is that he's at least a weekly user, and the Court is absolutely

21   correct that the status quo is unacceptable and some

22   consequences are going to flow from this.  People don't use

23   cocaine repeatedly over and over for months and then not have a

24   revocation of supervised release as a consequence of that, and

25   may be that's kind of a shock treatment to him, he doesn't want

1    to go to jail, it's going to have consequence.  It's going to

2    impact his family, and I hate to see it, and he's had tragedies

3    in his family, but that may be the kind of shock treatment that

4    may be will get him to stop, so the government really does

5    believe that a revocation and a period of incarceration may be

6    the most beneficial thing for him and everyone around him.

7              THE COURT:  Well, my thoughts on incarceration is that

8    there's an intensive drug treatment program that he can be

9    enrolled in during the time of his incarceration that he would

10   benefit by before he takes advantage of his commercial driver's

11   license, gets back behind the wheel and is able to support his

12   family.  It does no one any good for him to be driving a vehicle

13   possibly under the influence of drugs.  This is not an isolated

14   occurrence, any of these instances.  It does no one any good to

15   take that risk, and the people that it does the least amount of

16   good are his family and his children.  Now, if there's a period

17   of time when he's separated from them, but he benefits by that

18   time in several ways, number one, he no longer has a drug

19   problem, and he's released.  Number two, he's able to hold and

20   maintain a job using his commercial driver's license which he

21   presently has, then he can provide for his family in the long

22   term, but it seems to me that fashioning some type of short term

23   solution at this point does nothing but place him, his family

24   and the general pubic at risk.  If gets in an accident and a

25   family driving a vehicle, a van or something, is killed, then I

1   consider that to be on my watch at this point, and it's a chance

2   that I don't think that I'm willing to take.  He can get daily

3   drug testing for the duration of his supervised release.  The

4   problem with that is not only the practicality of it, because

5   the gentleman works from early in the morning until an hour, you

6   know, 6:00 or 630, he testified to.  I don't know that it would

7   be possible to give him daily drug testing both as a practical

8   matter and as a cost effective matter.

9        MS. KENT:  Well, he would be doing the intensive drug

10  treatment program which he's enrolled in now, and I don't know

11  how their drug testing works, eight times a month, two times a

12  week.

13       THE DEFENDANT:  Eight times a month.  I did tell my

14  employer my situation.  I told them that.  I asked them -- they

15  want me to report over there and have a group meeting Monday

16  through Friday, 5:30 to 6:30 for six weeks and continued on.  I

17  told my boss yesterday what was going on, and I asked them is

18  there any way possible that I can get off earlier.  He said 4:00

19  o'clock so I can make it to these meetings every day and they

20  were willing, they said, yes, they can do that.

21       And, Your Honor, I know it may sound kind of strange

22  coming from somebody who used drugs over a six-month period,

23  but, I mean, I need to be with my family right now.  My family,

24  if I go to jail today, my four kids are going to kicked out.  My

25  girlfriend is due -- I mean, my fiancée is due December the 8th

1    for another kid.  They will get kicked out.  I mean, I'm not
2    doing any drugs no more.  I see reality.  When I came in turned
3    myself -- when I come to see my parole officer, and the marshals
4    put the handcuffs on me, I said, man, I done went to far.  It's
5    time for me to stop this, because it's about to affect my life,
6    and, I mean, one of the reasons I stated earlier was that
7    because of the situation that I was going through was really no
8    excuse, because nobody put a gun in my head to make me use
9    drugs, but I'm just asking that you take that into consideration
10   I'm not, if I come up dirty on one of these tests I'd be willing
11   to do whatever, 10 years if you sentence me to that, that's my
12   words.  I'm finished with drugs.  I just want to be home with my
13   family.  I'm taking it my color code is ready, I called here
14   yesterday, and it's going to be like twice week.  It's from 4:30
15   to 7:00 o'clock.  My meeting is from 5:30 to 6:30, so right
16   after my meeting I have to go in and take a urinalysis, it's
17   twice a week.

18           I'm just asking for another chance, Your Honor, because
19   right now it's not safe for me --

20           THE COURT:  Well, but, Mr. Lucas, you tell me that when
21   you're under stress, when you're depressed.  I think you said
22   you were under stress, and that was the reason for you getting
23   back into cocaine use.  There's no guarantee that you're not
24   going to be under stress ever again.  You will be under stress
25   as an adult male living especially in the New Orleans area.

1    Most people are under stress, but to resort, especially in your
2    job, to resort to using some type of drug.  You've had -- Ms.
3    Kent just made reference to the fact, well, you know, in
4    September of 2004, that you weren't revoked at that time, and,
5    you know, that wouldn't have even been brought up except for the
6    fact that we're here today on these others, and that's true,
7    because we're pretty patient.  When somebody makes one mistake
8    or two mistakes when they're on supervised release we generally
9    try to be patient, try to be understanding.  The probation
10   office reports those things to us, and we say, "okay, well,
11   let's see if we can we can get the person on the straight and
12   narrow", and we've done that in your case.  We've been very
13   patient with some of these things that you've missed, and we've
14   accepted explanations for them, and the fact that you're here
15   for the first time, some two years after some of these other
16   events, I think is a testament to the fact that we have what
17   tried to be patient for you to get on the straight and narrow,
18   and instead of us overlooking those pervious omissions and you
19   completing supervised release, if anything, it's gotten worse,
20   because now we have the positive drug tests.  It's not a
21   question of missing a drug test, missing a urinalysis like it
22   was in September of '04, it's coming to have the drug test and
23   giving a positive result, so I hear what you're saying.  You
24   tell me that, you know, if you had another chance, but you've
25   already had several chances, and that's the problem that I have.

1    I mean, I've got to think about what circumstances are going to

2    be best for your family, and if you wind up getting into some

3    further trouble, or God forbid, somebody who's trying to kill

4    you that accidentally wrongfully killed your cousin winds up

5    killing you, then how does that help your family?

6         THE DEFENDANT:  Your Honor, I think. I mean, that's one

7    of the reasons why I ask that you guys don't send me back in

8    prison.  If there's anything I can do on the street, community

9    service, whatever, I just can't go back into prison, because

10   it's not safe.  It's just not safe with the people that's in

11   prison.

12        THE COURT:  You just got finished testifying that you

13   think that there are certain people that suspect that as a

14   result of your cooperation that they're going to try to kill you

15   as they did you your cousins, so you're telling me you're not

16   safe in prison.  You're not safe here in the neighborhood you

17   lived in.

18        MS. KENT:  He's moved from the neighborhood where he

19   was in the FEMA trailer to his momma's house on Commerce Street,

20   so there is some separation of geographic separation.

21        And, Judge, I dare say that the intensive drug

22   treatment afforded by Methodist that he signed up for now is at

23   least as good as whatever would be offered in prison if probably

24   not better, because prison has high hopes, but it just never

25   works out that way.  Prison is not the rehabilitation place that

1  people would like to think it is.

2          THE DEFENDANT:  Your Honor, I mean, I actually have

3  help now.  Today will my actual group meeting.  I have never

4  been a group setting where I can actually open up to people who

5  have been there, and the man that's directing it he's been in my

6  shoes, so I never been in this type of setting where I can

7  actually communicate with people who know exactly where I'm

8  coming from, and the mental part that's displayed, and I just

9  ask that you just give me a chance and let me work it, work the

10 12 steps.

11         MR. MURPHY:  Your Honor, if I could just jump in.

12         He is not far from his last use of cocaine.  And the

13 last positive test was this month not many days ago.  I don't

14 doubt his sincerity, but given the powerful addictive nature of

15 that drug and the destructive properties it has, he's not that

16 far from it.  This is not a test that was done four or five

17 months ago, this is a test that done, what, about three weeks

18 ago.  I think the Court's initial concerns were right on the

19 mark, and as much as it's sad, I think it's the right thing to

20 do.

21         THE DEFENDANT:  I just took a drug test with Mr. Mike

22 Fulham and I passed it.

23         THE COURT:  All right.  Let me go ahead and make my

24 findings.  Unless anybody has any anything further, I make my

25 findings as to the violations.

1        The Court finds the defendant, Kenny Kindell

2   Lucas, has violated the terms and conditions of his term of

3   supervised release by first testing positive for Hydromorphone

4   on January 25th, 2005, as a result of taking Vicodine prescribed

5   to his mother, and the Court will note for the record that that

6   the violation though factually correct does not play a part in

7   the Court's decision here today in terms of revocation based on

8   the explanation that seems to be uncontradicted.  Second,

9   testing positive for cocaine on May, 10th, August 2nd, and

10  October 4th, 2006.  Third, failing to complete the orientation

11  and life skills program and failing to report on August 17th,

12  and September 14th, 2004 to schedule sessions that would have

13  satisfied this condition.  Fourth, failing to report to the

14  Methodist Counseling Center for an unscheduled urinalysis on

15  September 6, 2004.  Fifth, failing to submit monthly supervision

16  reports for July 2005 through January 2006 until February 9th,

17  2006.  And sixth, failing to report to the United States

18  Probation Office on September 6th, 11th, 18th, and 26th, of

19  2006.

20        The Court has considered the relevant statutes and case

21  law as well as the advisory provisions of the United Sates

22  Sentencing Guidelines, and the Chapter 7 Policy Statements of

23  the Sentencing Commission, because the defendant tested positive

24  for cocaine on the dates previously indicated, and admitted to

25  knowing and voluntary use and possession of cocaine on the dates

1  of that use, the Court finds that the defendant unlawfully you
2  possessed a controlled substance for purposes of 18 USC Section
3  3583(g)(1). Thus, the Court finds that the revocation of the
4  defendant's supervised release and imprisonment to be mandatory
5  under that statue.  However, under 18 USC, Section 3583(d)
6  requires the Court to consider whether the availability of
7  appropriate substance abuse treatment programs, or an
8  individual's current or past participation in such programs
9  warrants an exception in accordance with the United States
10 Commission Guidelines from the mandatory revocation rule of
11 Section 3583(g), when considering any action against the
12 defendant who fails a drug test.  Having considered these
13 factors, the Court does not find that an exception to the
14 mandatory revocation and imprisonment requirement of Section
15 3583(g) of Title 18 is warranted in this case.

16        While on supervised release, Mr. Lucas has repeatedly
17 used illegal drugs, has failed to comply with the other
18 conditions of supervised release that are designed to insure his
19 successful completion of the sentence imposed.  The Court notes
20 that supervised release is part of the sentence of the
21 conditions of supervised release have got to be met.  It is well
22 established that at the time of sentencing that those conditions
23 must be met or up to the balance of supervised release could be
24 served in prison, so the fact that these supervised release
25 conditions are placed, they're not suggestions for better

1   living, they are requirements that the defendant is required to

2   meet.  Under these circumstances, the Court does not believe

3   that offering participation in a substance abuse program, such

4   as the one discussed here today, as an alternative to

5   incarceration would be appropriate.  Rather, the Court finds

6   that the defendant would more appropriately benefit from

7   participation in drug treatment programs, such as the

8   residential drug treatment program offered the Bureau of Prisons

9   to incarcerate persons.  Even if the Court did not find

10  revocation and imprisonment to be mandatory under Section

11  3583(g), the Court for similar reasons finds revocation and

12  imprisonment to be appropriate under the discretionary

13  authorization provided under 18 USC, Section 3583(e)(3).

14          Having found revocation and imprisonment to be

15  warranted, the Court must determine the appropriate term of

16  imprisonment.  Under the Chapter 7 Policy Statements, the

17  applicable range of prison time depends on the defendant's

18  criminal history category and the grade of the supervised

19  release violation.  According to Section 7B1.1(B) of the Policy

20  Statements when there is more than one violation of the

21  conditions of supervision, the grade of the supervised release

22  violation is determined by the violation having the most serious

23  grade.  Here, the defendant's criminal history category is a 1,

24  and all of the supervised release violations are Grade C

25  violations.  Accordingly, the Court finds that the applicable

1  range of imprisonment under the advisory guidelines is 3 to 9

2  months.  The Chapter 7 Policy statements, however, are not

3  binding on the Court.  Rather, pursuant to Section o3583(3), 18

4  USC, Section, the Court may sentence the defendant up to three

5  years imprisonment less the time for which he has been

6  incarcerated in connection with this revocation proceeding.

7          All right.  Mr. Lucas, have you anything to say or

8  offer in mitigation before the Court determines your term of

9  imprisonment other than what you have already told us.  I will

10  allow either or both you and Ms. Kent to address the Court on

11  your behalf at this time.

12          THE DEFENDANT:  Like I said earlier, Your Honor, I'm

13  sorry of not complying with my supervision sentence to

14  incarceration, I just ask that it be light so I can get back to

15  my child that is due on Decameter the 8th.

16          THE COURT:  All right.  My Kent, anything you want to

17  add?

18          MS. KENT:  Yes, Your Honor, if the Court would consider

19  balancing a lower term of incarceration with a subsequent term

20  of supervised release.

21          Under supervised release, Mr. Lucas will be monitored

22  and he will get help.  I'm not sure that help would be

23  forthcoming in prison, but when he's on release he could be in

24  drug treatment and also mental heath treatment, Judge.  He's

25  been asking for that since he heard that people were looking for

1    him, and he's been telling Mr. Fulham and hasn't been getting

2    mental health treatment or any treatment, for that matter, until

3    now probation has signed him up for drug treatment.

4              THE COURT:    Okay.  Mr. Murphy, do you have anything to

5    add?

6              MR. MURPHY:  Nothing further, Your Honor.

7              THE COURT:  All right.  Before I issue my sentence in

8    this case, Mr. Lucas, I covered on the record a lot of my

9    concerns in this case, and these concerns are to reiterate them

10    for your benefit, and I know that incarceration is the last

11    thing to have as a result of this.

12              My concerns are number one, treatment of your drug

13    problem.  Number two, preservation of your ability to hold your

14    job, because if you have a drug problem you're going to lose

15    your license, or worse yet, if you get in an accident with a

16    drug problem you're going to lose that license, and that's your

17    source of income right now.  Number three, to protect the

18    public.  I've already said extensively that my concern is that

19    if you are on drugs while you're driving a heavy vehicle you

20    place the pubic at risk, so that's a problem as well.  To

21    protect the public, and also to protect you.  You have some

22    concerns about on the west bank, and I don't in any way doubt

23    that your concerns are valid.  It's well documented what's going

24    on there, and I've seen the record in this case as to your

25    initial term of incarceration, and the Rule 35, and I know the

circumstances.  I think I understand the position that you're
in.  The problem is that you have to look at the long term as to
how you're best going to be able to support and provide for your
family both financially and being able to be there.  You've got
four children.  You're soon going to have a fifth child.  If
something happens to you in the short term while I try to be
patient and let you get back on the straight and narrow, then
you're of no help to your family, so I know that in the short
term this is probably not the best scenario for you.  You
probably would vigorously disagree agree, I know Ms. Kent would
as to the Court's decision, but I hope that you can appreciate
it when you think about this that my concerns to a large agree
are not to punish you, but rather to try to help you even though
it's going to be costly in the short term.  I don't expect you
to understand that here today, but I want you to know that
that's what the Court is looking at in fashioning a sentence in
your case.

Pursuant to the Sentencing Reform Act of 1984, as
amended and as modified by the U.S. Supreme Court decision in US
v. Booker, and US v. Fanfan rendered on January 12, 2005.  It's
the judgment of this Court that the defendant's term of
supervised release imposed on January 7, 2001, is revoked, and
that the defendant, Kenny Kindell Lucas, is committed to the
custody of the Bureau of Prisons for a period of 27 months.
Upon release from imprisonment, the defendant will be place on

1  who supervised release for a term of nine months, and the

2  conditions previously placed on supervised release will be

3  maintained along with the -- I don't know if we had the

4  employment condition, but you will have to maintain full time

5  employment while you're on supervised release for those nine

6  months.  Also I think we've had the drug testing condition, that

7  you're quite familiar with. That will also be in place for the

8  nine months of supervised release.

9      Revocation and imprisonment for this length of time

10  have been chosen because the defendant, first, has continued to

11  use illegal drugs during his supervised release, including

12  earlier this month.  Second, the defendant has not fully

13  cooperated with his probation officer's efforts to insure that

14  the defendant satisfies the conditions of his supervised

15  release; and third, to allow the defendant further opportunity

16  to benefit from intensive drug treatment programs, including the

17  residential drug treatment program offered through the Bureau of

18  Prisons.

19      The Court is also aware that pleading certain drug

20  treatment programs offered by the Bureau of Prisons will benefit

21  the defendant when he is ultimately released and placed back on

22  supervised release.

23      The Court recommends to the Bureau of Prisons that if

24  possible the defendant be assigned to a facility where he can

25  receive treatment for drug abuse, including the possible the

1  participate in the aforementioned drug treatment program.  The

2  Court is also going to recommend that he be placed at a facility

3  where he can receive appropriate mental health treatment as

4  requested and as referenced on the record here today, and also

5  that he be incarcerated at a facility as close to southeastern

6  Louisiana as possible for the benefit of his family.  The Court

7  is also going to remand the defendant here today into the

8  custody of the Marshal.

9          Anything further at this time, counsel?

10          MS. KENT:  Would the Court consider a self surrender?

11 Because he will stay in a local prison facility for at least six

12 weeks and more like two months or even longer at which time he

13 will receive absolutely no drug treatment, no nothing.  I mean,

14 it's strictly a holding facility.  If the Court would allow him

15 to self surrender, he could cut hair as a barber, earn a little

16 bit of money for his family, and at least be productive as

17 opposed to just being warehoused

18          THE DEFENDANT:  Your Honor, I do have checks that I

19 have to get from my job.  I'll be willing to step down if you

20 let me self surrender.  I can work with my step father doing

21 carpentry work.  I wouldn't drive trucks, but I have checks that

22 I need to get this week, this Friday and next Friday.  And, Your

23 Honor, I just ask that you give me some time to be with my kids

24 for a week or two or something.

25          THE COURT:  Mr. Murphy, is there any objection from the

1    government to give him a self surrender date?

2            MR. MURPHY:  Your Honor, if the Court is comfortable in

3    doing it, the government would not object.

4            THE COURT:  Well, my concern, and my purpose in

5    remanding today, was that I didn't want you to leave here and

6    get behind the wheel of a vehicle again.

7            THE DEFENDANT:  I'm not driving.

8            THE COURT:  In the next few weeks because then we will

9    have defeated the purpose of everything that I have tried to

10   incorporate into my sentence.

11           THE DEFENDANT:  I wouldn't drive, Your Honor.  I

12   wouldn't drive.  I wouldn't drive nowhere.

13           MS. KENT:  Your Honor, if Mr. Lucas would be allowed to

14   go to Beverly and submit a resignation, I think when he gets out

15   he would have a better chance of going back to Beverly if he

16   gives them advance notice and does it in a proper fashion.

17           THE COURT:  One second.  Mr. Fulham.

18                   (OFF-THE-RECORD DISCUSSION)

19                        (ON THE RECORD)

20           THE COURT:  Mr. Lucas, I'm going to give you a self

21   reporting date to whatever institution the Bureau of Prisons

22   designates.  I'm going to make it for Monday, November the 13th.

23   If for some reason they cannot make a designation, then we will

24   roll it over to the next Monday, but November the 13th, I'll ask

25   Mr. Fulham to please advise them today of the Court's sentence

1   and ask them to please expedite a designation for you to report

2   to by noon on Monday November the 13th.  In the meantime, all of

3   the conditions of the bond that Magistrate Judge Shushan set

4   will remain in place.  All of the conditions that you had to

5   meet up to this point, including the drug meetings that you were

6   to go to, I want you to continue to go to those and if you stop

7   doing all that stuff, well, then we'll start your incarceration

8   earlier, you understand that, Mr. Lucas?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  So you go to this program that you just

11  started on, I want you to continue to go to that.  This is also

12  conditioned on your submitting a resignation.  I don't want you

13  driving commercial vehicles starting today.  All right.  If you

14  can make a living, if you can each some money cutting hair or

15  carpentry, then that's fine, but I don't want you placing the

16  public at risk by driving vehicles in the meantime until after

17  your incarceration term ends.  I hope you understand that my

18  purpose in this is that when you finally get out of prison that

19  you're clean from any time of type of drug use and that you're

20  able to hold down a job of your choice which you seem to enjoy

21  the truck driving, that you're able to maintain your commercial

22  driver's license hopefully for the rest you your life, and

23  you're able to support your family and your kids, who are going

24  to miss you for the next 27 months.  They will miss you, but

25  hopefully they will get a better father by the time you get out.

1    I hope you understand that, you know, getting back involved in
2    drugs is a dead end, and it's going to be a dead end whether I'm
3    sentencing you, whether Judge Clement sentences you or whether
4    somebody in the future sentences you, it's a dead end not only
5    for incarceration purposes, but it's dead end as unfortunately
6    your cousin fell a victim to, so let's go on from here.  If
7    there's any problem, Mr. Fulham, with the interim period before
8    his self reporting date, let me know, and we'll get you to sign
9    a self recording form, Mr. Lucas.  I think there's one attached.

10           MR. FULHAM:  Your Honor, if I may just interject, we
11   would like Mr. Lucas to be told that upon release he has to
12   report to the probation office to the district in which he
13   resides within 72 hours.  He cannot possess a firearm.  He would
14   participate in a drug testing flash/treatment program, and
15   mental health treatment, but just for the record, you know, I
16   believe he needs to be told that at this time.

17           THE COURT:  Right.  All of the conditions of supervised
18   release that Judge Clement imposed that you are to comply with
19   will be maintained, and that includes that you're not to possess
20   a firearm during your nine month supervised release.  That you
21   are to report to the probation office in the district that
22   you're released into.

23           Also that we are going to have the mental health
24   condition that you submit yourself to mental health treatment
25   while on supervised release at the direction of the probation

1    office, and I think I mentioned earlier the employment

2    condition.  When you're on your nine month supervised release

3    you have to either be employed full time or be able to

4    demonstrate to the Court that you've made good faith efforts to

5    obtain full time employmont during that nine month period.

6              We'll get you to sign this order to surrender.

7              MS. KENT:  And, Your Honor, if the Court could

8    recommend to the Bureau of Prisons to take into consideration

9    any separation needs that Mr. Lucas may have.  I mean, there's

10   people out looking for him, and as he said jails are not a

11   deterrent to that sort of behavior.

12             THE COURT:  The Court will make that recommendation as

13   well.  I don't know what all that would involve, but I'm

14   familiar with the circumstances and the Court will make that

15   recommendation as well.  In other words, separation from other

16   federal prisoners that could be a danger to him.

17             MS. KENT:  Because of the reason he got the Rule 35.

18             THE COURT:  Right.  Right.

19             And to be clear, we are going to maintain the

20   electronic monitoring, such as it is, between now and the time

21   of his reporting date.

22             Anything further, counsel?

23             MR. MURPHY:  No, Your Honor.

24             THE COURT:   All right.

25             THE CLERK:  That completes your docket.

1          THE COURT:  Okay.

2          THE CLERK:  All rise.

3          Court's in recess.

4                    (11:45 A.M.  -   RECESS)

5          *         *         *         *         *         *

6                    **C E R T I F I C A T E**

7

8

9          I, Victor D. Di Giorgio, Official United States Court

10    Reporter in and for the Eastern District of Louisiana, do hereby

11    certify that the foregoing proceedings were taken down by me in

12    shorthand at the time and place aforesaid, transcribed under my

13    personal direction and supervision, and that the preceding pages

14    represent a true and correct transcription, to the best of my

15    ability and understanding.

16

17

18

19                                    _____
                                      Victor D. Di Giorgio, CCR
20                                    Official U.S. Court Reporter

21

22

23

24

25